OPINION OF THE COURT
Titone, J.
Appellants Morris Leisner and Max Marx were indicted on December 14, 1984, and charged with one count of conspiracy and numerous substantive counts of attempted extortion and coercion based upon their alleged involvement in a plot to force tenants from their rent-controlled apartments.[1] Appellants, who owned several buildings in Manhattan both individually and jointly, allegedly sought to rid the buildings of tenants by instilling fear of personal injury and property damage, thereby increasing the buildings’ resale value. Ultimately, appellants were convicted solely of conspiracy in the fourth degree (Penal Law § 105.10 [1]), and sentenced to indeterminate terms of imprisonment of from 1 to 4 years.
At trial, the prosecution attempted to show that Leisner and Marx hired Morris Lender and Hardman P. Lambert to *145 "relocate” tenants from the subject buildings.[2] As the proof at trial demonstrated, the relocation techniques used by Lender and Lambert were highly unsavory. From December 1978 to July 1980, Lender and Lambert installed drug addicts, pimps, prostitutes and assorted thugs in appellants’ buildings in order to coerce the tenants into abandoning their apartments. When threats, intimidation and abuse did not immediately produce the desired results, apartments were broken into and property was stolen or vandalized. According to the prosecution, appellants were aware of and condoned these actions.
With respect to the conspiracy count in the indictment, the prosecution endeavored to show that all of the aforementioned activities were part of one single integrated conspiracy. Although a majority of the buildings in question were individually owned, the prosecution theorized that the movements of the Lender-Lambert "group” were coordinated with the purchase and subsequent sale of buildings by Marx and Leisner, and that these activities constituted a unitary conspiracy to commit extortion. Eighty-six overt acts were alleged in the indictment, a significant majority of which occurred before December 14, 1979.
In defense to the substantive counts, both Leisner and Marx argued that they neither knew about nor authorized the use of any unlawful means to empty their buildings. In response to the conspiracy count, appellants argued that, if a conspiracy existed at all, the facts revealed three separate and discrete agreements concerning the relocation of tenants from different buildings: (1) the Marx buildings (W. 23rd St. and E. 30th St.); (2) the Leisner buildings (W. 22nd St., W. 80th St., Eighth Ave.); and (3) the jointly owned buildings (W. 53rd St.; W. 46th St., Ninth Ave. and 48th St.).
Based upon this argument, defendants submitted the following written request to charge: "[I]n order to convict either defendant of the conspiracy alleged in Count One, you must find that the single overall conspiracy alleged in that Count existed, and that each defendant joined that conspiracy. If you find that more than one conspiracy existed, you cannot convict either defendant of conspiracy unless you find that at least *146 one of those conspiracies is the conspiracy alleged in Count One and the defendants were members of that conspiracy.” In addition, appellants submitted a written charge directing that before the jury could convict either defendant of conspiracy, it must find that at least one overt act was committed within the past five years as required by the Statute of Limitations (CPL 30.10 [2] [b]). Neither of these charges nor their equivalents were given to the jury.
After a six-week trial and five days of deliberation, the jury acquitted Leisner and Marx of one count of attempted grand larceny and one count of attempted coercion, both involving the same tenant, Ion Burta. Both defendants were convicted of conspiracy to commit grand larceny in the first degree by extortion. The jury was unable to reach a verdict on the remaining substantive counts.
On appeal, appellants challenged, inter alia, the trial court’s failure to give the two above-mentioned charges. The Appellate Division rejected their arguments and affirmed the convictions. We now reverse.
WAIVER OF STATUTE OF LIMITATIONS CHARGE
Appellants argue that the trial court committed reversible error by refusing to charge, as requested in writing by appellants, that before the jury could convict either defendant of conspiracy, it must find that at least one overt act was committed after December 14, 1979. We agree.
The establishment by the prosecution of a timely overt act by one of the conspirators in furtherance of the conspiracy was clearly necessary to satisfy both the applicable Statute of Limitations (CPL 30.10 [2] [b]), and the elements of the crime (Penal Law § 105.20; see also, 1 Sand, Siffert, Loughlin & Reiss, Modern Federal Jury Instructions — Criminal, Aug. 1986 Supp, at 52-53 [Matthew Bender 1986]). Such an instruction was critical here because an overwhelming majority of the overt acts on which the People relied were outside the Statute of Limitations. Because it is impossible to determine at this point whether the conviction was supported by a timely overt act, it plainly cannot be said that the error was harmless (see, Yates v United States, 354 US 298; United States v Head, 641 F2d 174, on remand 697 F2d 1200, cert denied 462 US 1132; United States v Greichunos, 572 F Supp 220, 225-227).
Although it did not disagree that a Statute of Limitations charge would have been appropriate, the Appellate *147 Division concluded that reversal was not required because, in its view, appellants had withdrawn their requested charge on the issue, thereby waiving their objection to the court’s failure to so charge (138 AD2d 273, 276). We disagree. In People v Le Mieux (51 NY2d 981), this court noted that, under the clear language of CPL 470.05 (2), an objection is deemed preserved when the court fails to grant a written charge request, regardless of the absence of a specific postcharge exception. Further, even though the defendant in Le Mieux had made specific reference to other omitted charges while making only a blanket renewal of all his prior requests (including the request disputed on appeal), the issue was not forfeited because defendant had not "demonstrated a clear intent to waive a position already preserved” (id., at 983). In People v Whalen (59 NY2d 273), in contrast, the trial court stated that it was granting defendant’s submitted charge, but then delivered a different version than was requested by defendant. In that situation we held that "[w]hen a Judge grants a request to charge and then fails to deliver the charge as requested, the requesting party has an obligation to draw the error to the Judge’s attention” (People v Whalen, 59 NY2d 273, 280, supra). Finally, in People v Hoke (62 NY2d 1022), we concluded that when a Trial Judge denies a requested charge and, in its place, gives a different instruction on the same subject without a defense exception, the propriety of the court’s refusal to charge is preserved, but any issue as to the instruction as given is not.
Here, defense counsel made a written request to charge on the Statute of Limitations, but the trial court did not promptly rule on that request.[3] Thus, appellants were entitled *148 to assume their request had been denied (CPL 300.10 [5]). Additionally, since the trial court did not give a variation on the requested charge, appellants were under no further duty to preserve their claim (People v Whalen, supra). Therefore, this case is most similar to Le Mieux and the only question is whether appellants "demonstrated a clear intent” to abandon their request on the Statute of Limitations. We believe they did not.
During the precharge conference, the Statute of Limitations was mentioned in two contexts. First, the subject was broached in regard to two substantive counts involving Ion Burta, a tenant in the West 53rd Street building. Second, appellant Marx’s counsel raised the limitations issue in connection with the multiple conspiracy theory he had advanced. Neither of these discussions evinced a "clear intent” by defendants to waive their right to a Statute of Limitations charge on the entirely separate issue of the overt act element of the conspiracy count. Nor can such an intent be inferred from the fact that appellants’ counsel took 21 specific exceptions to the court’s charge, without mentioning the Statute of Limitations issue (see, People v Le Mieux, supra).[4]
MULTIPLE CONSPIRACIES
Since there must be a retrial, we deem it appropriate to comment on an additional error in the trial court’s charge so that its repetition may be avoided. Appellants argue that the trial court committed reversible error by refusing to charge the jury on the possibility of multiple conspiracies. Additionally, they argue that, at best, the proof at trial established a number of discrete conspiracies, not the single conspiracy alleged in the indictment. Appellants contend that the trial court’s refusal to charge as requested, and the prejudicial spillover effect resulting from combining separate conspiracies into a single count constitute reversible error. Although we reject appellants’ contention regarding the sufficiency of the evidence to establish the single conspiracy charged in the indictment, we agree that the trial court committed error in refusing to charge the jury on multiple conspiracies.
*149 The crime of conspiracy has been described as the "darling of the modern prosecutor’s nursery” (Harrison v United States, 7 F2d 259, 263 [Hand, J.]), perhaps because it exemplifies the " 'tendency of a principle to expand itself to the limit of its logic’ ” (Krulewitch v United States, 336 US 440, 445 [Jackson, J., concurring], citing Cardozo, The Nature of the Judicial Process, at 51) and furnishes the prosecution with potent evidentiary weapons. For instance, the overt acts of any conspirator may be attributed to other conspirators to establish the offense of conspiracy (People v McGee, 49 NY2d 48, 57). Similarly, the acts and declarations of any conspirator may be used against the others once a prima facie conspiracy case has been established (People v Salko, 47 NY2d 230, 237-238; People v Rastelli, 37 NY2d 240). In addition, a conspirator may be prosecuted in the county in which he entered into the conspiracy or in any county in which an overt act in furtherance of the conspiracy was committed (Penal Law § 105.25 [1]).
While such rules give the prosecution helpful tools in proving these often elusive crimes, they also create some risk of prejudice to the defense. This risk is greatest when the prosecution combines a number of seemingly related criminal agreements into a single integrated conspiracy count (see, Note, The Conspiracy Dilemma: Prosecution of Group Crime or Protection of Individual Defendants, 62 Harv L Rev 276 [1948]; Note, Developments in the Law — Criminal Conspiracy, 72 Harv L Rev 920, 983-985 [1959]; Note, Federal Treatment of Multiple Conspiracies, 57 Colum L Rev 387, 397-398 [1957]). In such circumstances, the "all too real” danger that a jury will find guilt by association is well recognized (see, Berger v United States, 295 US 78; Kotteakos v United States, 328 US 750, 772-773; Krulewitch v United States, 336 US 440, 445 [Jackson, J., concurring], supra). Moreover, jury confusion may arise when the prosecution’s proof establishes several discrete conspiracies, but not the single integrated conspiracy charged in the indictment. Indeed, it has been noted that "[t]his danger of sacrificing individual justice arises most often * * * wherein questions are raised as to. whether there was one single conspiracy or several minor conspiracies” (United States v Eubanks, 591 F2d 513, 522 [Ely, J., concurring] [9th Cir]; see also, United States v Sperling, 506 F2d 1323, 1340-1341, cert denied 420 US 962 [cautioning that use of single conspiracy indictments may lead to unnecessary exposure to reversal]).
*150 Although this court has never addressed the problems created when the prosecution attempts to combine a series of agreements into a single integrated conspiracy, the Federal courts have been struggling with the dilemma for some 40 years (see, Berger v United States, 295 US 78, supra; Kotteakos v United States, 328 US 750, supra; see generally, Note, Federal Treatment of Multiple Conspiracies, op. cit.). The Federal Circuit Courts appear to be in agreement that the determination as to whether a single conspiracy was demonstrated by the evidence is a classic question of fact (see, United States v Alessi, 638 F2d 466 [2d Cir]; United States v Brito, 721 F2d 743 [11th Cir]; United States v Michel, 588 F2d 986 [5th Cir], cert denied 444 US 825; United States v Perry, 550 F2d 524 [9th Cir], cert denied sub nom. Ware v United States, 431 US 918). Thus, the jury must be instructed on the single-multiple conspiracy issue when the facts are such that a jury might reasonably find either a single conspiracy or multiple conspiracies (see, United States v Cambindo Valencia, 609 F2d 603, 625 [2d Cir]; United States v Eubanks, 591 F2d 513, 518 [9th Cir], supra ["(i)f it is possible under the evidence for the jury to find that multiple conspiracies existed, then the court should instruct the jury on the issue”]; but see, e.g., United States v Martino, 664 F2d 860; United States v Ocampo, 650 F2d 421).
Like the Federal courts, we believe that because the clarity of the charge is so crucial in these complex conspiracy trials, a charge must be given explicitly recognizing the possibility of multiple conspiracies and directing an acquittal in the event that the jury concludes that something other than a single integrated conspiracy was proven. Such a charge is required whenever the possibility of more than one conspiracy is supported by a reasonable view of the evidence (see, CPL 300.10 [2]; see also, People v Butts, 72 NY2d 746; People v Farnsworth, 65 NY2d 734; People v Padgett, 60 NY2d 142; People v Johnson, 45 NY2d 546; People v Torre, 42 NY2d 1036; People v Steele, 26 NY2d 526; People v Asan, 22 NY2d 526; People v Moran, 246 NY 100).
In this case, although the prosecution’s "single conspiracy” approach was certainly viable, there was also a reasonable view of the evidence to support appellants’ contention that any conspiracy or conspiracies proven were narrower in scope than the single overarching one charged in the indictment. Appellants point out that Morris Lender, the prosecution’s chief witness, testified that Max Marx had nothing to do with *151 the Leisner buildings (22nd St., Eighth Ave., 80th St.), and did not participate in the vacating of those buildings. Lender further testified that there was no agreement between Marx and Leisner concerning the relocation of tenants from those buildings. Additionally, Max Marx testified that he had no interest in the Leisner buildings, that he had nothing to do with vacating the Leisner buildings, and that Leisner had no interest in his buildings. This testimony supported appellants’ contention that whatever Leisner did at his buildings in no way "depended” on whether Marx succeeded or failed at vacating his own buildings, and vice versa, and that, consequently, there was no single overarching conspiracy. Accordingly, the trial court’s failure to charge the jury on the possibility of multiple conspiracies was error.[5]
We note, however, that even though a reasonable view of the evidence supports the multiple conspiracy charge, appellants are not entitled to a dismissal of the conspiracy count. Viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have found that the single integrated conspiracy alleged in the indictment had been proven beyond a reasonable doubt (Jackson v Virginia, 443 US 307, 319; People v Contes, 60 NY2d 620, 621; Matter of Anthony M., 63 NY2d 270, 280; People v Lewis, 69 NY2d 321, 324).
In support of their single conspiracy theory, the prosecution relied upon what has become known as a "wheel conspiracy” approach, with the Lender-Lambert group as the hub and appellants both individually and jointly serving as the spokes. However, a single conspiracy cannot be found unless there is a "rim of the wheel to enclose the spokes” (Kotteakos v United States, 328 US 750, 755, supra). No matter the geometric shape taken by a conspiracy, "the gist of the offense remains the agreement, and it is therefore essential to determine what kind of agreement or understanding existed as to each defendant” (United States v Borelli, 336 F2d 376, 384 [2d Cir] [Friendly, J.], citing Note, Developments in the Law — Criminal Conspiracy, op. cit., at 923-933; see also, United States v Falcone, 109 F2d 579, affd 311 US 205 [Judge Learned Hand’s formulation of the stake in the venture test]; Note, Resolution *152 of the Multiple Conspiracies Issue Via a "Nature of the Enterprise” Analysis: The Resurrection of Agreement, 42 Brooklyn L Rev 243 [1975]; Wechsler, Jones, Korn, The Treatment of Inchoate Crimes in the Model Penal Code of the American Law Institute: Attempt, Solicitation, and Conspiracy, 61 Colum L Rev 957, 979-990 [1961]).
In order to prove the existence of such a "rim”, i.e., a single controlling agreement, the prosecution relied on the timing of appellants’ purchasing, vacating and selling of the subject buildings, and the coordinated movements of the Lender-Lambert group (see, Note, Federal Treatment of Multiple Conspiracies, op. cit., at 388-389, n 12; United States v Tramunti, 513 F2d 1087, 1106, as well as the existence of a "joint economic benefit” which, the prosecution argues, was demonstrated by the evidence that there was, in fact, disguised joint ownership of some of the buildings (see, People v Ruiz, 130 Misc 2d 191, 193; United States v Tilton, 610 F2d 302, 307 [5th Cir]; United States v Bernstein, 533 F2d 775, 791 [2d Cir], cert denied 429 US 998).[6] We agree that a rational trier of fact could have inferred a single integrated conspiracy from this evidence. Accordingly, reversal and a retrial, rather than dismissal, is the proper remedy.
For the foregoing reasons, the orders of the Appellate Division should be reversed and a new trial ordered.
Chief Judge Wachtler and Judges Simons, Kaye, Alexander, Hancock, Jr., and Bellacosa concur.
In each case: Order reversed, etc.

. Appellants were indicted for conspiracy in the fourth degree (Penal Law § 105.10), 10 counts of attempted grand larceny in the first degree (Penal Law §§ 110.00, 155.40 [now § 155.42]), two counts of grand larceny in the first degree (Penal Law § 155.40 [now § 155.42]), 10 counts of attempted coercion in the first degree (Penal Law §§ 110.00, 135.65), two counts of coercion in the first degree (Penal Law § 135.65) and two counts of burglary in the third degree (Penal Law § 140.20). Appellant Leisner was also indicted for an additional six counts of attempted grand larceny in the first degree and six counts of attempted coercion in the first degree.

. The nine buildings involved in the conspiracy count of the indictment are: 345-347 West 22nd Street; 204 Eighth Avenue; 140 West 80th Street (Leisner’s buildings); 351-353 West 53rd Street; 410-412 West 46th Street; 704-708 Ninth Avenue; and 367-369 West 48th Street (buildings owned jointly by Leisner and Marx); 171 West 23rd Street and 155-157 East 30th Street (Marx’s buildings).

. After reviewing appellants’ written charge requests, the Trial Judge endorsed on some of them either "covered by charge” or "refused”, and made his annotated copy a court exhibit. The Judge did not, however, explicitly rule on the Statute of Limitations request. Instead, he simply underlined the relevant date constituting the limitation deadline. Relying on this, the majority below concluded that the Trial Judge had not yet rejected appellants’ request, but was apparently relying on the oral charge conferences to clarify appellants’ position on the issue (138 AD2d 273, 276). This position is untenable. As pointed out by the dissent below, there is no indication that appellants’ counsel ever saw the Judge’s annotated copy. While appellants’ requests were marked during the precharge conference, the court made reference to them for the first time during the postcharge conference. At this time, the court merely invited counsel to look at the annotations, but did not instruct them to do so. Thus, appellants’ counsel were aware only that they had submitted a written charge, and that it had not been given in any form whatsoever. The Appellate Division’s belief as to what the Trial Judge must have thought is sheer speculation.

. The fact that two of appellants’ exceptions concerned written charges which had been submitted and not given by the trial court, other than the Statute of Limitations charge, is of no legal consequence, since appellants were under no duty to bring such charges to the Judge’s attention (People v Hoke, 62 NY2d 1022; People v Le Mieux, 51 NY2d 981).

. Since we are reversing on another ground, we need not address whether the Appellate Division’s application of the "substantial prejudice” test, the harmless error rule applied by the Federal courts, was proper (see, Berger v United States, 295 US 78; Kotteakos v United States, 328 US 750; Note, Federal Treatment of Multiple Conspiracies, 57 Colum L Rev 387).

. At trial, Marx testified that he had no ownership interest in 140 West 80th Street, but the evidence at trial showed that this building had been purchased by 650 Tenth Avenue Corporation, a company in which he conceded he was a principal and a signatory on a joint bank account with Leisner.